REQUESTED BY: Senator George Coordsen Nebraska State Legislature
You have requested our opinion regarding whether LB 600, which would change the manner in which the value of agricultural and horticultural land is determined for property tax purposes, is consistent with the authority granted the Legislature to provide for the classification and taxation of agricultural and horticultural land under Neb. Const. art. VIII, § 1. LB 600 proposes to change the current method of valuing agricultural and horticultural land at eighty percent of its "actual value", which is statutorily defined as "market value." Neb. Rev. Stat. §§77-112 and 77-201(2) (Cum. Supp. 2000). Under LB 600, the "actual value" of agricultural land would no longer be based on a percentage of "market value", but would be determined on the basis of "the capitalized net earning capacity" of the land as used for agricultural or horticultural purposes. LB 600, § 2. Your question is whether the Legislature's adoption of a "capitalized net earning capacity" method to value agricultural and horticultural land is authorized by subsections (4) and (5) of Neb. Const. art. VIII, § 1.[1]
[1] You have asked us to review the validity of LB 600 based on consideration of the authority granted the Legislature under both subsections (4) and (5) of Article VIII, § 1. Subsection (5) contains the so-called "Greenbelt" provision which was added to the Constitution in 1972. 1972 Neb. Laws, LB 837 § 1. This subsection provides: "[T]he Legislature may enact laws to provide that the value of land actively devoted to agricultural or horticultural use shall for property tax purposes be that value which such land has for agricultural or horticultural purposes without regard to any value which such land might have for other purposes or uses;. . . ." The legislation initially implementing this constitutional provision reveals the intent of the "Greenbelt" amendment was to protect farmers and ranchers owning land near urban areas from being taxed based on the speculative market value of the land for potential non-agricultural use. SeeCommittee Statement on LB 359, 83rd Leg., 1st Sess. (1973) ("[T]his bill provides for special assessment for agricultural purposes within agricultural use zones . . . for . . . the owner of such land in rural-urban fringe areas subject to high valuations because of nearby residential and industrial developments. . . ."). The Legislature has responded to passage of the "Greenbelt" amendment by allowing for special valuation of agricultural land which is "zoned predominantly for agricultural or horticultural use. . . ." Neb. Rev. Stat. § 1344(1) (Cum. Supp. 2000). LB 600 proposes only a small modification to the Greenbelt statutes (Neb. Rev. Stat. §§ 77-1343 to 77-1348 (Cum. Supp. 2000)), a minor change to § 77-1343. LB 600, § 4. Thus, it appears the principal issue raised by your request is whether the separate classification of agricultural land and horticultural land, and the valuation of such class of land in a different manner than other real property, is permissible under subjection (4) of Article VIII, § 1.
Subsection (1) Article VIII, § 1, provides: "Taxes shall be levied by valuation uniformly and proportionately upon all real property and franchises as defined by the Legislature except as otherwise provided in or permitted by this Constitution;. . . ." Subsection (4) of Article VIII, § 1, provides:
[T]he Legislature may provide that agricultural land and horticultural land, as defined by the Legislature, shall constitute a separate and distinct class of property for purposes of taxation and may provide for a different method of taxing agricultural land and horticultural land which results in values that are not uniform and proportionate with all other real property and franchises but which results in values that are uniform and proportionate upon all property within the class of agricultural and horticultural land;. . . .
This language was added to Article VIII, § 1, in 1990, when the voters approved an amendment proposed by the Legislature, 1989 Neb. Laws, LR 2CA.[2] LR 2CA was intended to address concerns resulting from a 1987 Nebraska Supreme Court decision stating that a 1984 amendment to Article VIII, § 1, permitting the Legislature to establish agricultural land as a separate and distinct class of property for tax purposes, did not exempt agricultural land from the requirement of uniformity in relation to all other tangible property as mandated at that time by Article VIII, § 1. BannerCounty v. State Bd. of Equal. and Assess., 226 Neb. 236,411 N.W.2d 35 (1987) ["Banner County"].[3] Following passage of the 1984 constitutional amendment (known as "amendment four"), the Legislature, in 1985, enacted LB 271. LB 271 was intended to implement amendment four by modifying the manner in which agricultural land was valued for property taxation. As explained in the Banner County case, LB 271 established a valuation system for agricultural land "based on the earning capacity of such land". 226 Neb. at 245, 411 N.W.2d at 42. Under LB 271, agricultural land was divided "into major use categories and such categories into subclasses based on soil classification. . . ."Id. at 246, 411 N.W.2d at 42. The approach adopted under LB 271 based agricultural land value on its income-producing capability as determined by soil and land type. The five use categories established were "irrigated cropland, dryland cropland, pasture, rangeland, and wasteland." Id. at 247, 411 N.W.2d at 42. LB 271 contained a "formula" to derive agricultural land value by computing the "income stream" (estimating future earnings derived from the land) divided by a "capitalization rate" (discounting the earnings to present value). "Income streams" were to be determined for each category of land. Id. For irrigated and dryland cropland, income streams were "computed by multiplying gross receipts by landowner share by county." Id. The "capitalization rate" contained a blend of "debt" and "equity" components, with the debt portion set at 20 percent and the equity portion at 80 percent.Id. at 247, 411 N.W.2d at 43. The debt portion was multiplied by "the most recent 5-year average of the Federal Land Bank interest rates in the Omaha district, resulting in the weighted debt capitalization rate." Id. at 247-48, 411 N.W.2d at 43. The owner equity portion was "multiplied by the most recent 5-year average of 6-month U.S. Treasury bill interest rates, resulting in the weighted equity capitalization rate." Id. at 248, 411 N.W.2d 43. These numbers were "then added together to obtain the appropriate capitalization rate." Id.
Discussing the effect of amendment four on the applicability of the uniformity requirement in Article VIII, § 1, as to the separate class of agricultural land established by the enactment of LB 271, the Court in Banner County stated:
The State Constitution requires that taxes be levied `by valuation uniformly and proportionately upon all tangible property' except motor vehicles. The constitutional amendment, upon which L.B. 271 is based, amendment four, permits agricultural property to be treated as a separate class for purposes of property tax. The amendment did not repeal the uniformity clause.
* * *
Since amendment four did not repeal the uniformity clause, expressly or by implication, the two clauses must be read in such a way as to give effect to both clauses. Thus, L.B. 271 must meet the requirements of both clauses to pass the test of constitutionality. Specifically, amendment four permitted the Legislature to classify property as a separate class, but the uniformity clause required the Legislature to treat that class in a uniform manner with other tangible property.
* * *
Since the uniformity clause was not repealed, the Legislature can divide the class of tangible property into different classifications, but these classifications remain subdivisions of the overall class of `all tangible property' and there must be a correlation between then to show uniformity. Such a correlation is made by evidence that all tangible property has been uniformly assessed.
No evidence of such a correlation is present in the record before us or in the statutes implementing amendment four. In fact, our review of the statutes shows the correlation requirement was entirely disregarded.
* * *
[The statutes] provide for the separate classification and valuation of agricultural property and are consistent with amendment four. Conspicuously absent from these statutes, however, is a requirement that the resulting values obtained for agricultural land be correlated with the values obtained for other real property as required by the uniformity clause.
These statutes have the effect of permitting the Legislature to do indirectly what it is prevented by the Constitution from doing directly-the taxation of agricultural land in a nonuniform manner from the taxation of other tangible property.
226 Neb. at 252-54, 411 N.W.2d at 45-46.
Prior to the Nebraska Supreme Court's decision in Banner County, it was generally understood that the adoption of amendment four was intended to allow the Legislature to establish agricultural land as a separate class of property which was not required to be valued and taxed uniformly with other property. See Note, SeparateProperty Tax Classification for Agricultural Land: Cure ofDisease?, 64 Neb. L. Rev. 313, 337-347 (1985); Note, Nebraska's"Mysterious" New Tax Valuation System: L.B. 271, the AgriculturalLand Valuation Law, 19 Creighton L. Rev. 623, 633-34 (1986). One commentator, discussing the presumed effect of amendment four, stated that "[t]he amendment allowed the legislature to set up a system which valued agricultural land other than on the basis of market value and at a valuation rate different from commercial or residential land." 19 Creighton L. Rev. at 634. LB 271, which established a method to value agricultural land based on an earning-capacity approach, was the vehicle chosen by the Legislature to implement amendment four.
This understanding of the intent and effect of amendment four was shattered by the decision in Banner County, however, when the Court held that amendment four, while it allowed the separate classification of agricultural land, did not except agricultural land from the requirement of uniform and proportionate valuation and taxation in relation to other property. In response, the Legislature proposed another constitutional amendment in 1989, LR 2CA, which was intended to clearly establish the Legislature's authority to separately classify agricultural land and to specifically allow the Legislature to "provide a different method of taxing agricultural land and horticultural land which results in values that are not uniform and proportionate" with other property, "but which results in values that are uniform and proportionate upon all property within the class of agricultural and horticultural land." 1989 Neb Laws, LR 2CA, § 1. The intent to separate agricultural and horticultural land from the requirement of uniform taxation in relation to other property was clearly stated in the Introducer's Statement of Intent accompanying LR 2CA:
This bill responds to the doubt the Nebraska Supreme Court has cast on the validity of Amendment 4 and LB 271 of 1985. My intent is to resolve this legal uncertainty by providing a clear exception to the uniformity requirement of the Nebraska Constitution for agricultural land.
Specifically, LR 2CA proposes a constitutional amendment to permit agricultural and horticultural land to be taxed as a separate class and assessed by a method which results in values which are not uniform or proportionate with other classes or subclasses of property.
Committee Records on LR 2CA, 91st Leg., 1st Sess., Introducer's Statement of Intent (Feb. 2, 1989).
LR 2CA was submitted to the electorate at the General Election held in November, 1990. The amendment was approved by an overwhelming majority, with 317,534 votes cast for adoption of the amendment, and 200,744 votes cast against. 1998-99 Nebraska Blue Book at 271. The changes made to Article VIII, § 1, by the 1990 amendment have remained part of the Constitution, and have twice been reenacted without substantial change.[4]
"A state Constitution is the supreme written will of the people of the state who have adopted it as a framework or basis of their government, subject only to the limitations to be found in the federal Constitution." Ramsey v. Gage County, 153 Neb. 24, 30,43 N.W.2d 593, 597 (1950). "Courts must apply and enforce the Constitution as it is written." State ex rel. Spire v. PublicEmployees Retirement Bd., 226 Neb. 176, 178, 410 N.W.2d 463, 465
(1987). "In construing a constitutional amendment to ascertain intent of the people in adopting it, courts must find such intent in the language of the amendment itself and must not hold that the people intended anything different than the language employed imports." Sorenson v. Swanson, 181 Neb. 205, 212-13,147 N.W.2d 620, 625 (1967). "[T]he courts should accord to [the language of the constitution] the meaning which obviously would be accepted by the layman." Mekota v. State Bd. of Equal., 146 Neb. 370, 378,19 N.W.2d 633, 638 (1945).
The plain language of subsection (4) of Article VIII, § 1, expressly permits the Legislature to establish agricultural and horticultural land as a separate class of property for purposes of taxation, and allows the Legislature to establish a method of taxing agricultural and horticultural land which results in values which are not uniform and proportionate with other real property. While the Legislature is allowed to separately classify agricultural and horticultural land, and to value agricultural and horticultural land in a different manner than other real property, subsection (4) of Article VIII, § 1, does require that the valuation method for agricultural and horticultural land result in values which are uniform and proportionate within the class of agricultural and horticultural land. Thus, subsection (4) permits the separate classification of agricultural and horticultural land, and nonuniform taxation of agricultural and horticultural land in relation to other real property, but requires uniformity of taxation within the separate class of agricultural and horticultural land.
Consistent with subsection (4) of Article VIII, § 1, LB 600 continues to provide the agricultural and horticultural land as defined by the Legislature "shall constitute a separate and distinct class of property for purposes of property taxation. . . ." LB 600, § 3; Neb. Rev. Stat. § 77-201(2) (Cum. Supp. 2000). Under LB 600, however, the valuation of agricultural and horticultural land for property tax purposes would no longer be based on "eighty percent of its actual [i.e. market] value" (Neb. Rev. Stat. § 77-201(2) (Cum. Supp. 2000)); rather, it would "be valued uniformly and proportionately within this distinct classification on the basis of its capitalized net earning capacity for agricultural or horticultural purposes. . . ." LB 600, § 3. As subsection (4) of Article VIII, § 1, allows the Legislature to separately classify agricultural and horticultural land for property taxation, and to establish a different method to value agricultural and horticultural land for property taxation which does not result in values which are "uniform and proportionate with all other real property (i.e., commercial and residential real property), we conclude that the separate classification of agricultural and horticultural land and taxation of such land based on a different method (capitalized net earning capacity) than other real property (market value) under LB 600 is authorized under this portion of the Nebraska Constitution.[5]
While the separate classification of agricultural land for property tax purposes, and the establishment of a different method of valuing agricultural land (capitalized net earning capacity) as opposed to the manner of valuing other real property (market value) is authorized by Article VIII, § 1, a question may exist as to whether the different taxation of agricultural and non-agricultural land violates the guarantee of equal protection of the law mandated by the Fourteenth Amendment to the United States Constitution. In Banner County, the Nebraska Supreme Court, in dicta, noted that, as the issue was not presented, the Court would "not undertake to determine whether a Nebraska constitutional amendment permitting land which produces income by raising crops to be taxed differently than land which produces income by other means would violate the U.S. Constitution."226 Neb. at 255, 411 N.W.2d at 47. In raising this question, the Court cited the U.S. Supreme Court decision in Sioux City Bridge Co. v.Dakota County, 260 U.S. 441 (1923), which held that the failure to provide a taxpayer with equal tax treatment in accordance with a state constitutional requirement of uniform taxation resulted in a violation of the due process and equal protection guarantees contained in the Fourteenth Amendment.
The equal protection clause "imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation." Allied Stores of Ohio, Inc.v. Bowers, 358 U.S. 522, 526 (1959). In structuring their internal tax structures, "the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation." Lehnhausen v. Lake Shore AutoParts Co., 410 U.S. 356, 359 (1973). It is inherent in a state's power to tax that it be free to select the subjects of taxation, and to grant exemptions. Carmichael v. Southern Coal and Coke Co.,301 U.S. 495 (1937). In order for a state tax classification or scheme to withstand scrutiny under the equal protection clause, it is necessary only to consider whether the challenged classification or tax is rationally based and related to a legitimate state purpose. Exxon Corp. v. Eagerton, 462 U.S. 176
(1983). "A state law is not arbitrary thought it `discriminate[s] in favor of a certain class . . . if the discrimination is founded upon a reasonable distinction, or difference in state policy,' not in conflict with the Federal Constitution." Kahn v. Shevin,416 U.S. 5351, 355 (1974) (quoting Allied Stores of Ohio, Inc. v.Bowers, 358 U.S. 522, 528 (1959)). As the Court stated in its decision in Allegheny Pittsburgh Coal Co. v. County Comm'n ofWebster County, 488 U.S. 336, 344 (1989): "The States, of course, have broad powers to impose and collect taxes. A State may divide different kinds of property into classes and assign to each class a different tax burden so long as those divisions and burdens are reasonable."
In Nordlinger v. Hahn, 505 U.S. 1, 112 S.Ct. 2326 (1992), the Court considered an equal protection challenge to a California property tax system that included unequal or disparate real estate taxation of similar pieces of property, depending on the date of acquisition by the property owner. Under this system, property taxes could vary as much as 1,700 percent, since long-term owners were subject to lower taxes reflecting historic property values at the time of acquisition, while newer owners paid higher taxes based on the use of more recent values reflecting current market values. The Nordlinger Court upheld the constitutionality of the California property tax scheme, finding at least two rational bases for the California tax program, and further noted that "[f]or purposes of rational-basis review, the `latitude of discretion is notably wide in . . . the granting of partial or total exemptions upon grounds of policy.'" Id. at 17,112 S.Ct. at 2335 (quoting F.S. Royster Guano Co. v. Virginia, 253 U.S. 412,415 (1920)). The Court concluded:
Time and again, however, this Court has made clear in the rational-basis context that the `Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think that a political branch has acted'. . . .
Id. at 17-18, 112 S.Ct. at 2336 (quoting Vance v. Bradley,440 U.S. 93, 97 (1979)).
Applying the traditional standard of review used to judge the validity of classifications of property for tax purposes, a rational basis can likely be articulated to justify the separate classification of agricultural land and the adoption of an "earning capacity" method of valuing agricultural land. Section 1 of LB 600 includes a legislative declaration "that the encouragement and support of agriculture and horticulture in Nebraska is a rational state policy", and a declaration that, "to achieve that policy, the value of agricultural and horticultural land for property tax purposes shall be determined based on the capitalized net earning capacity attributable to the inherent capabilities of the land at its current use as agricultural land or horticultural land." Most states provide for the separate classification of agricultural land for property tax purposes, 64 Neb. L. Rev. at 315n.9, and virtually all states provide a mechanism for "preferential assessment or taxation of agricultural land. . . ." J. Malme, Preferential Property Tax Treatment of Land 7 (Lincoln Institute of Land Policy 1993). "The rationale is that income from agricultural . . . production is low relative to the capital value required for the enterprise, making owners `land rich and income poor.' Farmers have high outlay costs, and high taxes on their lands further reduce meager profits, making farming economically infeasible." Id. at 8. The "unique nature of agri-business" and "concern over land use and the environment" have also been cited as factors justifying "preferential" tax treatment of agricultural land. 19 Creighton L. Rev. at 628. Thus, with regard to the valuation of agricultural land for property tax purposes, "[t]he predominant appraisal approach is the capitalization of income. Valuation of land according to its earning capacity is consistent with the policy of linking taxation to income derived from the land as opposed to the land's speculative market value." J. Malme, supra, at 22. In view of these factors, it appears a rational basis exists to sustain the Legislature's choice to utilize a "capitalized net earning capacity" method to value agricultural and horticultural land for property tax purposes.
As noted previously, however, the Nebraska Supreme Court in BannerCounty, citing the U.S. Supreme Court decision in Sioux CityBridge v. Dakota County, intimated that the federal equal protection clause may not permit a state constitutional provision allowing for taxation of agricultural land and other income-producing land in a different, non-uniform manner. We believe that this suggestion is not warranted by application of the appropriate equal protection analysis.
In Sioux City Bridge v. Dakota County, the Court held the failure to provide the taxpayer with equal tax treatment in accordance with a state constitutional requirement of uniform taxation resulted in a violation of the due process and equal protection guarantees contained in the Fourteenth Amendment to the United States Constitution. An important distinction, however, exists between the equal protection clause principle at issue in that case, and cases involving application of the rational basis standard. Sioux City Bridge involved application of the remedy required by the equal protection clause where intentional and systematic undervaluation of other taxable property in the sameclass under state law creates an inequity in the taxation of a taxpayer's property. See also Allegheny Pittsburgh Coal Co. v.County Comm'n of Webster County, 488 U.S. 336 (1989). The Nebraska Constitution no longer places "all real property" in the same class for property tax purposes. The Constitution now allows the Legislature to establish a separate classification for the taxation of agricultural and horticultural land, which may be valued in a manner which is not uniform with all other real property. Thus, the equal protection clause principle employed inSioux City Bridge and Allegheny Pittsburgh Coal Co. is inapplicable to judging the constitutionality of LB 600, and the proper equal protection clause analysis concerns whether the separate classification and taxation of agricultural land in a manner which is not uniform with other real property, as authorized by art. VIII, § 1(4), is rationally related to legitimate state purposes. Exxon Corp. v. Eagerton, 462 U.S. 176
(1983).
The Nebraska Supreme Court recently applied the rational basis standard of review in upholding application of the "net book value" method of assessing personal property for taxation. PfizerInc. v. Lancaster County Bd. of Equal., 260 Neb. 265,616 N.W.2d 326 (2000). The Court, noting the federal equal protection clause "does not forbid classifications", stated:
In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based may rationally have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational. . . . This standard is especially deferential in the context of classifications made by complex tax laws.
Id. at 273, 616 N.W.2d at 335 (citing Nordlinger v. Hahn,505 U.S. 1 (1992)).
The Nebraska Supreme Court's recent decision in Pfizer
demonstrates application of the proper equal protection clause analysis to be employed in assessing the validity of tax classifications authorized by state law. For the reasons stated above, we believe that the separate classification of agricultural and horticultural land by the Legislature, and establishment of a method of valuation (capitalized net earning capacity) different than the method used to value other real property for tax purposes (market value), is rationally related to legitimate state purposes, and thus can survive scrutiny under the federal equal protection clause.[6]
As the separate classification and taxation of agricultural land and horticultural land is authorized by subsection (4) of Article VIII, § 1, and does not contravene the federal equal protection clause[7], the question which remains is whether the "capitalized net earning capacity" valuation method proposed under LB 600 satisfies the requirement in subsection (4) that the manner of valuing agricultural and horticultural land for property tax purposes chosen by the Legislature must "result in values which are uniform and proportionate upon all property within the class of agricultural and horticultural land. . . ." On its face, the bill purports to mandate this result, providing that agricultural and horticultural land "shall constitute a separate and distinct class of property for purposes of taxation, . . ., and shall be valued uniformly and proportionately within this distinct classification on the basis of its capitalized net earning capacity for agricultural or horticultural purposes. . . ." LB 600, § 3. The bill further provides: "Agricultural and horticultural land values shall be determined on the basis of the land's use for agricultural or horticultural purposes. . ., capitalized and applied uniformly and proportionately among all classes and subclasses of agricultural and horticultural land. . . ." LB 600, § 6.
While the bill facially mandates compliance with the constitutional requirement of uniform valuation of property in the class of agricultural and horticultural land, this does not mean that, in application, the "capitalized net income approach" proposed under the bill will necessarily achieve this result. Under LB 600, the current practice of valuing agricultural land at 80 percent of its "market value" would be replaced by an entirely new system of valuation for agricultural and horticultural land which would require the use of a rather complicated "income capitalization methodology" to arrive at the value of agricultural and horticultural land for property tax purposes. The determination of "net earning capacity" under section 7 of the bill is similar to the formula used under LB 271 to calculate "income streams" for agricultural lands. See 1985 Neb. Laws, LB 271, § 9. The "capitalization rate" determination under section 10 of LB 600, however, differs from the "blended" rate established under LB 271. See 1985 Neb. Laws, LB 271, § 10. LB 271 established a "debt" percentage component of twenty percent, which was "weighted" by multiplying the debt percentage by the most recent five-year average of the Federal Land Bank's interest rate in the Omaha district. The "equity" component of the capitalization rate under LB 271 was set at eighty percent, and was "weighted" by multiplying this percentage by the most recent five-year average of six-month United States Treasury bill interest rates. The sum of the weighted debt and equity capitalization rates constituted the capitalization rate to be used under LB 271. Id.
It was suggested that the use of a single capitalization rate in LB 271 was unconstitutional because "a single rate would not accommodate different returns for different types of land," which would result in a lack of uniformity within the class of agricultural land. 19 Creighton L. Rev. at 646. Section 10 of LB 600 provides that the "capitalization rate" used to value agricultural and horticultural land "shall be a market derived capitalization rate" established by use of specified sources, or "other sources of capitalization rates determined to be acceptable by the Property Tax Administrator after consultation with and advisement from the Greenbelt Advisory Committee." It is unclear whether the capitalization rate proposed under section 10 of LB 600 is intended to require use of a "single" capitalization rate for all agricultural land, or whether the Property Tax Administrator is to develop different rates for the various types of land within the agricultural class. It may be appropriate to amend this portion of the bill to clearly express the Legislature's intent regarding whether a single capitalization rate is to be used, or whether different market based capitalization rates are to be developed. The guiding principle which the Legislature must follow is that the method employed must provide for uniform and proportionate valuation within the agricultural land class as required by art. VIII, § 1(4).
With regard to the capitalization rate portion of the bill, one source mentioned is "the rates established by the Band of Investment published by the International Association of Assessing Officers and Real Estate manuals or the Agriculture Statistics Districts published by the Department of Agriculture, in cooperation with the United States Department of Agriculture,. . . ." The bill also allows determination of the capitalization rate from "other sources of capitalization rates determined to be acceptable by the Property Tax Administrator after consultation with and advisement from the Greenbelt Advisory Committee." LB 600, § 10. The reference to "rates established by the Band of Investment" is somewhat confusing, as it implies that the "Band of Investment" is a compilation of actual rates. As we understand the term, it refers to a methodology in which "interest and yield rates are weighted by the proportion each would contribute in typical financing and summed to form a discount rate", which "rate is then used to estimate property value by capitalizing all net operating income." Property Appraisal and AssessmentAdministration 281 (International Association of Assessing Officers 1990). "Band of Investment" refers to a method of estimating a capitalization rate, as opposed to a listing of calculated rates. As the intent and effect of this language is somewhat unclear, it may require amendment. Thus, it may be necessary to consider revising this section to clarify the method and sources to be employed by the Property Tax Administrator in determining the market-based capitalization rate (or rates).
In sum, we conclude that the establishment of agricultural land and horticultural land as a separate and distinct class for property tax purposes, and taxation of such land based on a different method than other real property, is authorized pursuant to subsection(4) of Article VIII, § 1, of the Nebraska Constitution. In addition, we believe that the separate classification of agricultural land by the Legislature, and establishment of a method of valuation (capitalized net earning capacity) different than the method used to value other real property for tax purposes (market value), is rationally related to legitimate state purposes, and thus can survive scrutiny under the eequal protection clause of the United States Constitution. On its face, the bill appears to be constitutional, although the section concerning establishment of the "market derived capitalization rate" should be amended to clearly express the Legislature's intent as to the manner to be used by the Property Tax Administrator to determine such rate (or rates). Our conclusion is limited to determining that the Legislature's separate classification of agricultural and horticultural land, and valuing such land differently than other real property, is not facially unconstitutional. We can express no opinion as to whether the valuation methodology proposed would, in application, result in uniform and proportionate taxation of agricultural and horticultural land, consistent with Article VIII, § 1(4).
 Sincerely, DON STENBERG Attorney General
 L. Jay Bartel Assistant Attorney General
[2] The original language provided the Legislature could value agricultural and horticultural land in a manner resulting "in values that are not uniform and proportionate with all othertangible property and franchises. . . ." 1989 Neb. Laws, LR 2CA (emphasis added). This portion was amended in 1992 by substituting the word "real" for "tangible." 1992 Neb. Laws, LR 219 CA, § 1.
[3] Article VIII, § 1, has since been amended to eliminate the requirement of uniform taxation of "all tangible property and franchises", and now requires uniform taxation of "all real property and franchises as defined by the Legislature, except as otherwise provided in or permitted by [the] Constitution." Neb. Const. art. VIII, § 1, as amended by 1992 Neb. Laws, LR 219 CA.
[4] As noted, the reference to "tangible" property was amended to refer to "real" property in 1990, when Article VIII, § 1, was amended to make the uniformity requirement applicable only to "real" property, thus removing personal property from the rule of uniformity previously contained in the Constitution. 1992 Neb. Laws, LR 219 CA, § 1. The provision was also reenacted in 1998. 1998 Neb. Laws, LR 45 CA, § 1.
[5] Indeed, any other conclusion would call into question the existing method of valuing agricultural and horticultural land for property tax purposes, as such land is not taxed at the same level of value as other real property. Currently, agricultural and horticultural land is valued at 80 percent of market value, while other real property is assessed at full market value. Neb. Rev. Stat. §§ 77-112 and 77-201(2) (Cum. Supp. 2000). This different treatment can only be sustained if Article VIII, § 1(4), is construed to allow the separate classification of agricultural and horticultural land, and the taxation of such land in a manner which is not uniform with other real property. We believe the Nebraska Constitution, as amended, authorizes the Legislature to provide for such classification and nonuniform taxation of agricultural and horticultural land in relation to other real property.
[6] Prior to Pfizer, it was not clear that the Court recognized application of the rational basis standard of review to state tax classifications permitted by state law. See Jaksha v. State,241 Neb. 106, 109, 486 N.W.2d 858, 864 (1992) (While noting U.S. Supreme Court's decision in Nordlinger sustained an "acquisition value" system of taxing real property even though it resulted in "tremendous disparities in the property taxes levied upon owners of similar property", the Court nevertheless stated that "the precise contours of the federal Equal Protection Clause in the context of state taxation are far from clear."). The Pfizer
decision indicates that the Nebraska Supreme Court currently recognizes that the appropriate equal protection clause analysis to be used in judging the validity of tax classifications authorized by state law is the rational basis standard.
[7] We note that, in 1998, the Nebraska Constitution was amended by adding an "equal protection" clause providing that "[n]o person shall . . . be denied equal protection of the laws." 1997 Neb. Laws, LR 20CA, § 1, Neb. Const. art. I, § 3. The Nebraska Supreme Court has not had occasion to address the standard to be applied in judging classifications under the state equal protection guarantee now contained in art. I, § 3. See Pfizer v. LancasterCounty Bd. of Equal., 260 Neb. at 273, 616 N.W.2d at 335 (Noting taxes at issue were levied prior to adoption of the equal protection clause of the Nebraska Constitution in 1998). There is no indication that analysis of the validity of the separate classification and taxation of agricultural and horticultural land under LB 600 would be subject to a more stringent standard of review under the "equal protection clause" in art. I, § 3, than would be employed under the Fourteenth Amendment. Moreover, it is doubtful that art. I, § 3, applies, as the separate classification and taxation of agricultural and horticultural land is authorized by subsection (4) of art. VIII, § 1, "[n]otwithstanding . . . any other provision of this Constitution to the contrary;. . . ." Neb. Const. art. VIII, § 1.